# In the Iowa Supreme Court

No. 24–0239

Submitted September 10, 2025—Filed June 12, 2026

**State of Iowa,**

Appellee,

vs.

**Austin Dean Mahana,**

Appellant.

Appeal from the Iowa District Court for Cerro Gordo County, Adam D. Sauer, district associate judge.

A defendant convicted of unlawful possession of a firearm appeals, arguing that his conviction violated the Second Amendment to the United States Constitution and article I, section 1A of the Iowa Constitution. **Affirmed.**

Mansfield, J., delivered the opinion of the court, in which Christensen, C.J., and Waterman, McDermott, and May, JJ., joined. McDonald, J., filed an opinion concurring in the judgment, in which Oxley, J., joined.

Martha J. Lucey, State Appellate Defender, and Josh Irwin and Maria Ruhtenberg (argued) (until withdrawal), Assistant Appellate Defenders, for appellant.

Brenna Bird, Attorney General, and Olivia Brooks (argued) and Linda J. Hines (until withdrawal), Assistant Attorneys General, for appellee.

**Mansfield, Justice.**

### I. Introduction.

This case is our first opportunity to address the constitutionality of Iowa's "felon-in-possession law," *see* Iowa Code §§ 724.25(1), .26(1) (2022), following the occurrence of two legal milestones. First, in 2022 and 2024, the United States Supreme Court decided that any present-day restrictions on firearms would have to be supported by a valid historical analogue in order to be permissible under the Second Amendment to the United States Constitution. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022); *United States v. Rahimi*, 602 U.S. 680 (2024). Second, in 2022, the citizens of Iowa approved an amendment to our constitution providing that the right to "keep and bear arms" was "fundamental" and that any restrictions on that right would be subject to "strict scrutiny." Iowa Const. art. I, § 1A.

The defendant in this case was eager to test the constitutionality of Iowa's felon-in-possession law. Informed that he could not lawfully possess a firearm due to a 2018 conviction for the aggravated misdemeanor of carrying weapons, the defendant put a .22 caliber handgun and ammunition in his pockets and walked into the local police station, where he demanded that he be arrested. The police granted his wish. The defendant was then charged and convicted of unlawful possession of a firearm under Iowa Code sections 724.25(1) and 724.26(1).

The defendant does not dispute that Iowa Code sections 724.25(1) and 724.26(1) make it illegal for him to possess a firearm. Those sections prohibit anyone previously convicted of a "felony" from possessing a firearm, and they define felony to include any prior firearms offense punishable by more than a year in prison. *Id.* But the defendant insists that those provisions are

unconstitutional, both facially and as applied to him. He emphasizes that the legislature repealed the crime of carrying weapons—his predicate offense—in 2021, although the legislature didn't do anything to affect prior convictions such as his own.

We conclude that neither the Second Amendment nor article I, section 1A bar the defendant's conviction under the felon-in-possession law. Iowa Code sections 724.25(1) and 724.26(1) are not facially unconstitutional, nor are they unconstitutional as applied to this defendant, who has a more recent criminal history supplementing his 2018 carrying weapons conviction. This criminal history includes guilty pleas to carrying weapons (again), domestic abuse assault causing injury, and first-degree criminal mischief (damages in excess of $10,000). We find that disarming the defendant is permissible under historical analogues and that it is narrowly tailored to serve the compelling interest in public safety. Accordingly, we reject the defendant's constitutional challenges and affirm his criminal conviction under sections 724.25(1) and 724.26(1).

## II. Facts and Procedural Background.

On December 5, 2022, Lieutenant Rich Jensen of the Mason City Police Department phoned Austin Mahana, the defendant. Mahana wanted to know about getting back his .40 caliber semiautomatic handgun that had been seized by police as part of a criminal investigation. Several months before, Mahana had gotten into an argument with a group of individuals over a parking space at a local campground. One of the individuals had put Mahana into a headlock, and Mahana had shot him in the stomach with the .40 caliber handgun. Mahana claimed he had done so in self-defense.

Lieutenant Jensen informed Mahana in the December 5 phone call that he was not going to be charged over the campground shooting. But he advised

Mahana that he was not going to get his firearm back because he was not eligible to possess a firearm in Iowa due to a 2018 conviction for the aggravated misdemeanor of carrying weapons. *See id.* § 724.4(1) (2018) (defining the offense of carrying weapons).

Mahana became very upset. He started using profanity and demanded that he be charged so that the charge could be thrown out as violating the Second Amendment.

Later that same day, Mahana entered the lobby of the Mason City police station carrying a different firearm—a .22 caliber handgun. The handgun's grip was sticking out of Mahana's pocket and Mahana had five .22 cartridges on his person. Lieutenant Jensen was called to the scene, and he arrested Mahana without further incident.

A trial information was filed in the Cerro Gordo County District Court charging Mahana with two counts of possessing a firearm after having previously been convicted of an offense involving a firearm punishable by imprisonment for a term exceeding one year, a class "D" felony. *See id.* §§ 724.25(1), 724.26(1) (2022). The first count related to Mahana's possession of the .22 caliber handgun at police headquarters on December 5; the second count related to his possession of the .40 caliber handgun at the campground the previous May.

Mahana initially represented himself with the assistance of standby counsel. He filed a motion to dismiss the information based on the Second Amendment to the United States Constitution and article I, section 1A of the Iowa Constitution. The parties argued the motion and agreed that Mahana's entire criminal record as well as certain videos could be considered with the motion. The district court denied that motion in a written ruling. Mahana filed an application for an interlocutory appeal with our court, which was also denied.

At that point, Mahana requested an attorney. His attorney filed a renewed motion to dismiss that again raised both the Second Amendment and article I, section 1A.

At the hearing on the renewed motion, both parties introduced additional evidence relating to Mahana's prior notice. Mahana pointed out that his 2018 sentencing order had not mentioned a ban on possessing firearms and that he had been self-represented at the time. The State introduced the recording of Lieutenant Jensen's December 5, 2022 phone call to establish that, at least by that date, Mahana had been made aware that Iowa law forbid his possession of a firearm. Following the hearing, the district court denied Mahana's renewed motion.

Later, the parties agreed that the State would dismiss count two and that count one would be tried to the court based on the minutes of testimony. The trial on the minutes had a proviso that the defendant could "present any defense he wants in live testimony or any other format he wants." So at the trial, Mahana took the stand.

Mahana reiterated that until he spoke to Lieutenant Jensen on the morning of December 5, he had not known that he was not allowed to possess a firearm under Iowa law.[1] He also testified that his appearance at the police station with a firearm had been a "protest" and that he believed his actions were protected by the Second Amendment and the Iowa Constitution. Finally, Mahana testified further regarding his need for a firearm for self-defense purposes. Mahana also incorporated by reference the points and arguments from both of the prior motions to dismiss.

[1]Mahana received a separate deferred judgment in early 2020, and he concedes that he was aware he couldn't possess firearms during the two-year probationary period of that deferred judgment.

On December 12, 2023, the district court entered findings and a verdict of guilt, determining that Mahana had illegally possessed a firearm in the Mason City police station in violation of Iowa Code sections 724.25(1) and 724.26(1). The court also once more denied Mahana's initial and renewed motions to dismiss. On February 7, 2024, the court sentenced Mahana to five years in prison, with the sentence suspended and to be served concurrently with Mahana's sentences in two other criminal cases.

Mahana appealed. He argues that his conviction should be reversed because Iowa Code sections 724.25(1) and 724.26(1) violate the Second Amendment and article I, section 1A. We retained the appeal.

### III. Standard of Review.

"We review constitutional claims de novo." *In re N.S.,* 13 N.W.3d 811, 820 (Iowa 2024) (plurality opinion) (quoting *Mitchell County v. Zimmerman,* 810 N.W.2d 1, 6 (2012)).

### IV. Legal Analysis.

**A. Both Facial and As-Applied Challenges Are Before Us.** Iowa Code section 724.26(1) makes it a class "D" felony for a person previously "convicted of a felony in a state or federal court" to knowingly possess a firearm. Section 724.25(1) defines "felony" as used in section 724.26 to include any offense involving a firearm that is punishable by imprisonment for a term exceeding one year. *Id.* § 724.25(1).

Mahana, as we have discussed, walked into the Mason City police station carrying a .22 caliber handgun and ammunition, despite having received a 2018 aggravated misdemeanor conviction involving a firearm. He argues on appeal that his conviction for unlawful possession of a firearm under sections 724.25(1) and 724.26(1) violates the Second Amendment and article I, section 1A.

The State questions whether Mahana raised both a facial challenge and an as-applied challenge in the district court. We think it is clear that both challenges were raised and are before us.

1. *The arguments and evidence submitted in the district court on the initial motion.* Mahana's original pro se motion to dismiss wasn't a bare legal argument. It raised several points about his personal situation. Mahana stated that he had not been aware before December 5, 2022, that he could not possess a firearm. He told the court he had been convicted of "a few petty crimes" but had never misused a firearm. He explained that he needed a firearm for self-defense because his job required him to go door-to-door during the winter when it was often dark.[2] Mahana also offered his version of his December 5 arrest at the Mason City police station which, in his view, demonstrated his peaceable behavior.

The State countered with a similar factual showing in its resistance. The State noted that in addition to Mahana's 2018 conviction for carrying weapons, he had also pleaded guilty in January 2020 to domestic abuse assault causing bodily injury, a serious misdemeanor, and another count of carrying weapons. For those charges he had received a deferred judgment. He successfully discharged his two years of probation on those charges.[3]

Additionally, just six weeks before the December 5, 2022 incident, Mahana had been arrested for first-degree criminal mischief for causing over $10,000 worth of damage. By the time the State filed its resistance, Mahana had pleaded

---

[2]However, in his financial affidavit filed when he applied for appointment of counsel, Mahana stated that he had no job and no income.

[3]Mahana was also convicted of fifth-degree theft, a simple misdemeanor, for which he received a fine in 2018.

guilty to that offense, a class "C" felony, *see* Iowa Code § 716.3(2), and was awaiting sentencing.

The State also offered into evidence a number of YouTube videos produced by Mahana in which he appeared on screen, at times calling himself "Agent Trenchcoat." In one, entitled "The Feds vs. the Militia," Mahana warned agents of the United States Internal Revenue Service and the United States Department of Homeland Security that "once you come door-to-door and you start fighting us, we're not going to sleep until you're all dead. . . . And we will follow you, and we will find you." In another video entitled "Reporting for Duty," Mahana explained that he had not been making videos recently because he had been on probation and had not been allowed to have "bing bangs"—i.e., firearms. But he added that he "always had them" and "[t]he government's not going to disarm me."

Both in its resistance filings and at the hearing, the State used the terms "facial challenge" and "as-applied challenge" and expressed its view that the Iowa Code sections survived both forms of challenge.

2. *The district court's ruling on the initial motion.* The district court recognized that both types of challenges were before it when it issued a seven-page written ruling denying Mahana's initial pro se motion to dismiss. First, the court rejected Mahana's Second Amendment arguments based on an analysis of historical analogues. That is, the court found that disarmament of persons convicted of felony and felony-equivalent offenses fit within the "text, history, and tradition" of permissible firearm regulation. This analysis didn't turn on the specific facts of the case, and thus it wasn't necessary to distinguish the facial and the as-applied challenges.

Yet when the court turned to article I, section 1A, it included separate sections in its order devoted to Mahana's "facial challenge" and his "as-applied challenge." With respect to the latter, the court observed that "Iowa Code sections 724.26(1) and 724.26(2)(a) survive strict scrutiny analysis on [Mahana's] as-applied challenge based on the specific facts of this case and Defendant's criminal history."

3. *The subsequent motions to dismiss.* Later, with the benefit of counsel, Mahana filed a renewed motion to dismiss. That motion relied on several facts specific to Mahana's situation, including his belief that he had a right to bear arms, the fact that the 2018 sentencing order did not advise Mahana that he would lose his right to bear arms, and the fact that Mahana had represented himself in 2018, at least at sentencing. The district court denied the renewed motion as well. Among other things, the court noted in its ruling that Lieutenant Jensen had advised Mahana he wasn't eligible to carry a firearm prior to Mahana being arrested in the police station.

At trial, Mahana's counsel reurged both motions. The district court denied both motions once again, doing so this time in the same ruling in which it found Mahana guilty of violating sections 724.25(1) and 724.26(1).

Therefore, based on the foregoing, we have little doubt that Mahana raised and preserved both a facial challenge and an as-applied challenge to Iowa Code sections 724.25(1) and 724.26(1).

**B. Mahana's Conviction Does Not Violate the Second Amendment.** We begin with the Second Amendment challenge.

1. Bruen *and* Rahimi. Two recent United States Supreme Court opinions— *New York State Rifle & Pistol Ass'n v. Bruen* and *United States v. Rahimi*—provide much of the legal landscape. We have discussed these cases in some detail in

our own recent decisions. *See State v. Woods*, 23 N.W.3d 258, 264–65 (Iowa 2025) (plurality opinion), *petition for cert. filed*, No. 25–5746 (U.S. Sep. 26, 2025); *State v. Kieffer*, 17 N.W.3d 651, 664 (Iowa 2025). We will not repeat that discussion here.

Nevertheless, several salient points about *Bruen* and *Rahimi* stand out and are worth restating. Second Amendment review of a firearms restriction does not entail "means-ends" scrutiny. *Bruen*, 597 U.S. at 22–24. Instead, when a law regulating the possession or use of firearms is challenged, the government must justify it by demonstrating that "the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. The challenged regulation need not "precisely match its historical precursors," *id.*, but it must be "analogous enough to pass constitutional muster," *id.* (quoting *Bruen*, 597 U.S. at 30).

Thus, given our nation's history, the government may not "broadly prohibit[] the public carry of commonly used firearms for self-defense." *Bruen*, 597 U.S. at 38. But in light of our precedent of surety and going armed laws, the government may restrict "the possession of firearms by those found by a court to present a threat to others." *Rahimi*, 602 U.S. at 698. In short, "our Nation's tradition of firearm regulation distinguishes citizens who have been found to pose a credible threat to the physical safety of others from those who have not." *Id.* at 700.

As one respected federal appellate judge has summarized, "*Bruen* changed [*District of Columbia v.*] *Heller*'s approach to be more historical, and *Rahimi* recast *Bruen* to be more risk-centric (after observing that American history evinces this emphasis on danger)." *United States v. Prince*, 171 F.4th 1009, 1010 (7th Cir. 2026) (Easterbrook, J.).

This raises the question of whether someone previously convicted of a felony-level firearms offense has, in effect, been found to pose a threat to others and may be disarmed under the *Bruen-Rahimi* line of authority.

Here, the Court suggests yes, but it doesn't definitively say so. In *Rahimi,* the Court quoted language from its prior decision in *Heller* that prohibitions on possession of firearms by felons were "presumptively lawful." *Rahimi,* 602 U.S. at 699 (quoting *Heller,* 554 U.S. 570, 627 n.26 (2008)). The Court did so to demonstrate that *Rahimi* was consistent with *Heller. See id.*

In the wake of *Rahimi,* various federal appellate courts have considered Second Amendment challenges to 18 U.S.C. § 922(g)(1), the federal equivalent to Iowa Code section 724.25(1). The federal statute criminalizes possession of firearms by any person "who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1). Mahana, of course, was convicted of an aggravated misdemeanor, which is a crime punishable by up to two years in prison. *See* Iowa Code § 903.1(2). Federal appellate courts have coalesced around two approaches to § 922(g)(1) and the Second Amendment. We briefly discussed those two approaches in *State v. Kieffer,* 17 N.W.3d at 665, a case that did not involve a felon-in-possession conviction, but we now feel compelled to discuss the two approaches in greater detail.[4]

2. *The view of some federal circuits that any prior felony conviction is disqualifying.*[5] The United States Court of Appeals for the Eighth Circuit and

---

[4]While federal court of appeals decisions are not binding on us, the decisions we refer to herein are scholarly and well-researched. We consider them the most fruitful source of legal authority in this area until the United States Supreme Court weighs in.

[5]18 U.S.C. § 922(g)(1) is generally referred to as the "federal felon in possession of a firearm law," *see, e.g., United States v. Watson,* 171 F.4th 1012, 1013 (7th Cir. 2026), although, as noted, it reaches any prior conviction punishable by more than a year in prison, such as an aggravated misdemeanor in Iowa. In discussing § 922(g)(1), we will refer to "felony convictions"

several other circuits have followed a categorical approach under which the Second Amendment permits disarmament of an individual for any felony conviction. Thus, in *United States v. Jackson,* 110 F.4th 1120, 1125–26 (8th Cir. 2024), the court held that it was not necessary to examine the conviction that led to the firearm prohibition. After reviewing our nation's tradition of firearm regulation, the court concluded that "legislatures traditionally possessed discretion to disqualify categories of people from possessing firearms to address a danger of misuse by those who deviated from legal norms." *Id.* at 1127. In addition, "[l]egislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed." *Id.* at 1128.

So, in the Eighth Circuit's view, 18 U.S.C. § 922(g)(1) was consistent with a tradition of "status-based restrictions to disqualify categories of persons from possessing firearms." *Jackson,* 110 F.4th at 1129. "Whether [felon-in-possession laws] are best characterized as restrictions on persons who deviated from legal norms or persons who presented an unacceptable risk of dangerousness, Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons." *Id.*

The Tenth Circuit has followed the same approach. In *Vincent v. Bondi,* 127 F.4th 1263, 1264 (10th Cir. 2025), a nonviolent offender who had been convicted of bank fraud brought a civil suit against the United States Attorney General to establish her right to possess firearms. The Tenth Circuit rejected the claim and reaffirmed earlier circuit precedent that "upheld the constitutionality

---

with the understanding that reference is being made to any conviction for a crime punishable by more than a year in prison.

of § 922(g)(1) without drawing constitutional distinctions based on the type of felony involved." *Id.* at 1266.

So too has ruled the Fourth Circuit. First, in *United States v. Canada,* 123 F.4th 159, 161 (4th Cir. 2024), the court rejected a facial challenge to § 922(g)(1). Then, in *United States v. Hunt,* 123 F.4th 697, 708 (4th Cir. 2024), the Fourth Circuit adopted the Eighth Circuit's position that "there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)." (Quoting *Jackson,* 110 F.4th at 1125.)

Likewise the Second Circuit. In *Zherka v. Bondi,* 140 F.4th 68, 96 (2d Cir. 2025), the court rejected an argument that § 922(g)(1) could not be constitutionally applied to persons convicted of nonviolent felonies. The court reasoned, among other things, that this would create "line-drawing" problems:

> Were we to decide that nonviolent felons are exempt from Section 922(g)(1), we would have to decide what would qualify a felon as violent or nonviolent. Would the sentencing court for a count adjudicating a later prosecution under Section 922(g)(1) look only at the underlying felony conviction, or would it consider other, unadjudicated facts about the individual's background? If the court were to consider the individual's background, which evidentiary standards would apply to prove those background facts and which background facts are relevant? If only the underlying felony conviction mattered, would the court look only at the elements of the crime to determine whether it qualifies as violent, or would it look at the facts of the underlying offense?

*Id.* at 94–95.

At least two other federal circuits have also concluded that all felons may constitutionally be disarmed. *See United States v. Hicks,* 166 F.4th 933, 938–39 (11th Cir. 2026) (per curiam) (summarizing the law of the circuit that statutes disqualifying felons from possessing a firearm under any and all circumstances do not violate the Second Amendment); *United States v. Duarte,* 137 F.4th 743, 762 (9th Cir. 2025) (en banc) ("Accordingly, § 922(g)(1) is constitutional as

applied to . . . non-violent felons."); *see also United States v. Hembree*, 165 F.4th 909, 911 (5th Cir. 2026) (noting that the Second, Fourth, Eighth, Ninth, Tenth, and Eleventh Circuits have concluded that § 922(g)(1) may be constitutionally applied to persons with any prior felony conviction), *petition for cert. filed*, No. 25–1219 (U.S. Apr. 27, 2026).

3. *The view of other federal circuits that only some felony convictions are disqualifying.* But other circuits have taken a different view. They have read *Bruen* and *Rahimi* to require a more case-specific approach to the constitutionality of § 922(g)(1), although they differ somewhat as to what aspects of a defendant's background may be considered.

In opting for case-by-case analysis, the Sixth Circuit began with the premise that "several historical examples authorized the official doing the disarming . . . to make the dangerousness determination." *United States v. Williams*, 113 F.4th 637, 657 (6th Cir. 2024). According to the Sixth Circuit, this means that today a defendant with a prior felony conviction may still be able to demonstrate that they are not dangerous and therefore fall "outside of § 922(g)(1)'s constitutionally permissible scope." *Id.* Making this dangerousness determination requires the court to "focus on each individual's specific characteristics." *Id.* "That necessarily requires considering the individual's entire criminal record—not just the predicate offense for purposes of § 922(g)(1)." *Id.* at 657–58. The court may also consider "other judicially noticeable information." *Id.* at 660. "[N]othing in the Second Amendment's text or history limits 'dangerousness' to the particular felony (if any) listed in an indictment or plea agreement." *Id.*; *see also, e.g., United States v. Wilkinson*, No. 24–5778, 2026 WL 907890, at *3 (6th Cir. Apr. 2, 2026) (per curiam) (considering the defendant's entire criminal record, "which contains many misdemeanors including several

DUI convictions, reckless driving, several other driving offenses, criminal mischief, public intoxication, drug possession, and two convictions for fleeing and evading the police").

The Third Circuit has adopted a slightly different position. It has held that courts "must consider all factors that bear on a felon's capacity to possess a firearm without posing [a special danger of misusing firearms]." *Pitsilides v. Barr*, 128 F.4th 203, 211 (3d Cir. 2025). These include "a convict's entire criminal history and post-conviction conduct indicative of dangerousness, along with his predicate offense and the conduct giving rise to that conviction." *Id.* at 212. Utilizing this approach, the Third Circuit remanded for further factfinding in a case that involved a defendant with prior gambling convictions. *Id.* at 213. And in another case, it granted a declaratory judgment—holding § 922(g)(1) unconstitutional as-applied—in favor of an individual who had been convicted of food-stamp fraud more than two decades ago where the record contained no other evidence that this individual posed a physical danger to others. *Range v. Att'y Gen. U.S. of Am.*, 124 F.4th 218, 232 (3d Cir. 2024) (en banc).

Like the Sixth and Third Circuits, the Fifth Circuit has taken a case-specific approach. *See Hembree*, 165 F.4th at 912–13 (summarizing the circuit's prior caselaw); *see also United States v. Diaz*, 116 F.4th 458, 469 (5th Cir. 2024) ("[O]ur holding is not only premised on the fact that Diaz is a felon. Simply classifying a crime as a felony does not meet the level of historical rigor required by *Bruen* and its progeny."). But unlike in those circuits, the relevant specifics are limited to the defendant's prior felony convictions, and a court may not consider prior conduct that did not result in a felony conviction. *Diaz*, 116 F.4th at 467. The reason is that

> not all felons today would have been considered felons at the Founding. Further, Congress may decide to change that definition

in the future. Such a shifting benchmark should not define the limits of the Second Amendment, without further consideration of how that right was understood when it was first recognized.

*Id.* at 469.

As the Fifth Circuit has put it, "[W]e sift the elements of a defendant's prior convictions through *Bruen*'s analogical framework, and not the defendant himself." *United States v. Hernandez,* 159 F.4th 425, 428 (5th Cir. 2025) (per curiam). For example, felony drug trafficking convictions qualify, but felony convictions for simple drug possession do not. *Hembree,* 165 F.4th at 913, 918 (citing *United States v. Kimble,* 142 F.4th 308, 314–15 (5th Cir. 2025)).

The Seventh Circuit has so far considered only the defendant's prior felony convictions and has held that only persons convicted of "dangerous felonies" may be disarmed under § 922(g)(1). *United States v. Watson,* 171 F.4th 1012, 1023–25 (7th Cir. 2026). In *United States v. Watson,* the Seventh Circuit concluded that possession of cocaine with intent to distribute under § 922(g)(1) was a dangerous felony that could support a § 922(g)(1) conviction. *Id.* at 1025. The Seventh Circuit reserved ruling on whether a person previously convicted of a nondangerous felony could be disarmed and whether to consider a defendant's entire criminal history or just the predicate felony. *Id.* at 1025, 1024 n.8.

4. *Mahana's Second Amendment facial challenge.* We now turn to Mahana's Second Amendment contentions. First, we reject Mahana's facial challenge to Iowa Code sections 724.25(1) and 724.26(1). If bans on firearm possession by felons are "presumptively lawful," *Rahimi,* 602 U.S. at 699 (quoting *Heller,* 554 U.S. at 627 n.26), one would be hard-pressed to say that sections 724.25(1) and 724.26(1) are facially unconstitutional. They are not.

5. *Mahana's Second Amendment as-applied challenge.* Mahana's as-applied Second Amendment challenge requires more discussion. As we have

discussed above, there is a significant divergence of viewpoint between categorical circuits like the Eighth and case-by-case circuits like the Third. One is tempted to say that this split flows from two different possible interpretations of "presumptively lawful." *See id.* If the Supreme Court wanted presumptively lawful to mean, "We believe felon-in-possession prohibitions are lawful but we'll wait for an actual case to decide the issue," then the categorical approach makes sense. If presumptively lawful means, "Felon-in-possession prohibitions are lawful unless the individual makes a showing to overcome the presumption," then a case-by-case approach would be more sound.

Ultimately, we conclude that Mahana's as-applied challenge fails under either approach. Clearly, under the categorical approach, Iowa Code sections 724.25(1) and 724.26(1) pass Second Amendment muster because Mahana was previously convicted of a crime punishable by more than a year in prison. The categorical approach, in effect, finds the felon-in-possession ban acceptable under all circumstances. The legislature is entitled to disqualify a category of people "based on a conclusion that the category as a whole present[s] an unacceptable risk of danger if armed" and based on their "demonstrated disrespect for [the] legal norms of society." *Jackson*, 110 F.4th at 1127–28. There is no need for "an individualized determination of dangerousness." *Id.* at 1128.

As the Eighth Circuit points out, during the late eighteenth century, many large categories of persons were disqualified from possessing firearms despite the fact that individuals within those categories were neither violent nor dangerous. *Id.* at 1128.

Applying a case-by-case as-applied approach under the Second Amendment results in the same outcome. We are not persuaded to follow the Fifth Circuit's path. If a federal-felony-level conviction is not by itself enough to

allow the government to disarm someone, it's because the person may not present a significant risk to public safety. In that event, it seems counterintuitive to confine the risk analysis to a mere list of the person's prior federal-felony-level convictions, as the Fifth Circuit does, without going into anything else. A presentence investigation report isn't so limited. *See* Iowa Code § 901.3(1) (describing the subjects to be included in the presentence investigation report).

Nor has the Fifth Circuit convinced us that disarmament must be limited to those persons who commit predicate offenses that were felonies as of the late eighteenth century. That also seems too narrow. Again, if the issue is dangerousness, why not a more holistic view focusing on the danger inhering in the defendant's prior felony-level offense? And if the issue is whether a person can obey the law, why doesn't the present-day legislature get to define what constitutes serious law-breaking?

We opt instead to follow either the Sixth Circuit's or the Third Circuit's version of the case-by-case approach. Under the Sixth Circuit's version, we believe that Mahana's entire criminal record, including his 2018 carrying weapons conviction and his 2020 guilty pleas to domestic abuse assault causing bodily injury and carrying weapons (again) for which he received a deferred judgment, are before us. Although the 2020 guilty pleas were expunged from Mahana's criminal record, he admitted he committed these offenses and they are part of his criminal history for sentencing purposes. *See* Iowa Code § 907.5(1)(*b*); *State v. Formaro*, 638 N.W.2d 720, 725 (Iowa 2002).[6] Also, Mahana had been arrested in October 2022 for first-degree criminal mischief, a class "C" felony.

---

[6]The State submitted information about the 2020 deferred judgment below and asked the district court to consider it, emphasizing that Mahana had pleaded guilty to the two offenses. Mahana admitted that he had pleaded guilty. Mahana also acknowledged that he had pleaded guilty to the first-degree criminal mischief charge, although he objected to the court's considering it until he had been sentenced.

While this charge was merely pending as of December 5, 2022, Mahana pleaded guilty to it later that month. The essential point is that this admitted serious felony-level criminal act predates Mahana's arrest with the .22 handgun in the police station by only six weeks. *See Williams*, 113 F.4th at 660 (allowing consideration of "other judicially noticeable information").

Based on Mahana's track record of having recently committed two firearms violations, felony criminal mischief, and a serious misdemeanor involving domestic violence, we conclude that he fits into the type of individual who could have been disarmed when the Second Amendment was adopted. Therefore, his conviction does not violate that provision.

Under the Third Circuit's version of the case-by-case approach, we would also consider the remaining evidence entered into the record below, such as Mahana's "Agent Trenchcoat" videos.[7] We would then reach the same conclusion regarding dangerousness and the potential for law-breaking. We note that in one video, Mahana boasts of having possessed firearms during the period when he was on probation for his 2020 deferred judgment, even though he knew he shouldn't have them.

6. *The fact that carrying weapons is no longer a crime in Iowa.* Mahana points out that his prior "offense involving a firearm" is an offense that no longer exists. He argues that this undermines the State's ability to prosecute him under the Second Amendment as a felon in possession.

Until 2021, section 724.4(1) defined the crime of "carrying weapons" and provided,

> Except as otherwise provided in this section, a person who goes armed with a dangerous weapon concealed on or about the person,

---

[7]Both sides agreed that the district court could consider those videos when addressing Mahana's as-applied challenge.

> or who, within the limits of any city, goes armed with a pistol or revolver, or any loaded firearm of any kind, whether concealed or not, or who knowingly carries or transports in a vehicle a pistol or revolver, commits an aggravated misdemeanor.

Iowa Code § 724.4(1) (2018). Several exceptions existed. *Id.* § 724.4(4). Generally, it was legal to carry an unloaded pistol or revolver inside a closed and fastened container or securely wrapped package that was too large to be concealed on the person. *Id.* § 724.4(4)(*e*)–(*f*). It was also legal to carry the weapon if one had a valid permit. *Id.* § 724.4(4)(*i*).

In 2021, the legislature repealed these provisions. 2021 Iowa Acts ch. 35, § 9. So Iowa no longer has a crime of carrying weapons. Yet to us, the more pertinent inquiry is not whether Mahana's predicate offense is still on the books as a crime, but whether his conviction for that predicate offense *today* would still withstand constitutional attack.

Legislatures revise their criminal laws all the time. If Mahana violated a constitutionally valid criminal law relating to firearms, and the legislature has made a policy choice to repeal that law going forward but not to disturb its status as a prior criminal offense, we don't think we should be second-guessing that policy decision. *Cf. Watson*, 171 F.4th at 1024 (opining that a conviction that could have been vacated at the time on an as-applied Second Amendment challenge cannot serve as a valid predicate under § 922(g)(1)).

On that score, we read *Rahimi* and *Bruen* as generally allowing room for laws that restrict the carrying of concealed weapons or require individuals to obtain a firearms permit where issuance is not subject to official discretion. In *Rahimi*, the Court reiterated that "the right secured by the Second Amendment is not unlimited." 602 U.S. at 690–91 (quoting *Heller*, 554 U.S. at 626). "At the founding, the bearing of arms was subject to regulations ranging from rules

about firearm storage to restrictions on gun use by drunken New Year's Eve revelers." *Id.* at 691. Some jurisdictions "forbade carrying concealed firearms." *Id.*

In *Bruen,* the Court struck down New York's firearms licensing regime that conditioned "issuance of a license to carry on a citizen's showing of some additional special need [for self-defense]." 597 U.S. at 11. Unlike the great majority of other states with firearms licensing provisions, New York required an applicant for a license to show "proper cause," defined by the New York courts as "a special need for self-protection distinguishable from that of the general community." *Id.* at 12. After a "long journey" through the historical record, the Court concluded that tradition allowed prohibitions on concealed carry but that it protected public carry "subject to certain reasonable, well-defined restrictions." *Id.* at 70; *see also id.* at 59 ("States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly."). New York's "proper-cause requirement" went beyond those kinds of restrictions in that it "prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 71.

In a footnote, the Court added,

> To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' "shall-issue" licensing regimes, under which "a general desire for self-defense is sufficient to obtain a [permit]." Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent "law-abiding, responsible citizens" from exercising their Second Amendment right to public carry. Rather, it appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, "law-abiding, responsible citizens."

*Id.* at 38 n.9 (alteration in original) (citations omitted) (first quoting *Drake v. Filko*, 724 F.3d 426, 442 (3d Cir. 2013) (Hardiman, J., dissenting); and then quoting *Heller*, 554 U.S. at 635).

To highlight this point, two justices who joined the six-justice majority opinion filed a concurrence which stated that "the Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense." *Id.* at 79 (Kavanaugh, J., concurring). This concurrence continued, "Going forward, . . . the 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so." *Id.* at 80.

Hence, the prevailing view in the courts since *Bruen* was decided favors the constitutionality of nondiscretionary, shall-issue firearms licensing, such as Iowa had before 2021. For example, in *People v. Thompson*, ___ N.E.3d ___, ___, 2025 WL 1759061, at *1 (Ill. June 26, 2025), the Illinois Supreme Court upheld a conviction of an individual for possessing a loaded handgun in his vehicle without proper licensing. The court reasoned, "For the reasons expressed in *Bruen* itself, Illinois's shall-issue regime is not facially unconstitutional under the second amendment." *Id.* at ___, 2025 WL 1759061, at *10. In short, Mahana's prior 2018 firearms conviction wasn't itself a Second Amendment violation, which is what matters here.

In wrapping up our Second Amendment discussion, we note that in an unpublished opinion, the Fifth Circuit held that a prior conviction for "misusing weapons," i.e., "passing around a gun in a parked car," could constitute a constitutional basis for disarming an individual under § 922(g)(1). *United States v. Davis*, No. 24–20258, 2025 WL 958265, at *2 (5th Cir. Mar. 31, 2025) (per curiam). This strikes us as somewhat analogous to what Mahana was convicted

of in 2018, even though we are not following the Fifth Circuit's case-by-case approach because we believe it is too restrictive of the government.

For all these reasons, we affirm the district court's rejection of Mahana's Second Amendment challenge to his prosecution and conviction under Iowa Code sections 724.25(1) and 724.26(1) (2022).

**C. Mahana's Conviction Does Not Violate Article I, Section 1A.** We now turn to article I, section 1A of the Iowa Constitution. Although *Bruen* disapproves of means-ends scrutiny of firearm regulations under the Second Amendment, the Iowa Constitution *requires* it. Our state constitution mandates that strict scrutiny be applied to "[a]ny and all restrictions" on "[t]he right of the people to keep and bear arms." Iowa Const. art. I, § 1A. [8]

"Under strict scrutiny, 'the statute will survive a constitutional challenge only if it is shown that the statute is narrowly drawn to serve a compelling state interest.'" *Woods*, 23 N.W.3d at 276 (quoting *AFSCME Iowa Council 61 v. State*, 928 N.W.2d 21, 41 (Iowa 2019)). Mahana challenges Iowa Code sections

---

[8]The concurrence in the judgment agrees that we should apply "the well-established body of law in place at the time the amendment was adopted to determine that 'strict scrutiny' had a defined legal meaning at that time." That is what we do here.

But contradicting itself in the next paragraph, the concurrence then says that we should give a free pass to all firearms laws that were on the books when article I, section 1A was adopted because the legislature could not have intended to strike down any existing laws. This ignores the prior point that strict scrutiny is a legal term of art with an established meaning, and article I, section 1A demands that *all* restrictions be evaluated against it, not merely new ones adopted after article I, section 1A became effective.

*Chiodo v. Section 43.24 Panel*, 846 N.W.2d 845, 861–62 (Iowa 2014) (Mansfield, J., specially concurring), illustrates the situation where it might be appropriate to conclude that a constitutional amendment ratifies the existing law—and it is very different from the present case. The legislature and the voters of Iowa *reenacted* article II, section 5 of the Iowa Constitution in 2006–2008. *Chiodo*, 846 N.W.2d at 861 (Mansfield, J., specially concurring). Both before and after this reenactment, article II, section 5 provided that voters convicted of an "infamous crime" could not vote. *Id.* at 861–62. And, both before and after the reenactment, Iowa law defined "infamous crime" to mean a felony. *Id.* at 862. One could therefore rely on the principle that where legislation—or in that case a constitutional provision—was reenacted without change, the reenactment ratified the existing law. *Id.* at 862.

724.25(1) and 724.26(1) both facially and as applied to him, arguing that they cannot survive strict scrutiny. We hold that they do.

In applying strict scrutiny, we begin by identifying and acknowledging the state's compelling interest. We have previously held that "the state has a compelling interest in public safety, including preventing death and physical injury caused by firearms." *Woods*, 23 N.W.3d at 276; *see also In re Det. of Garren*, 620 N.W.2d 275, 286 (Iowa 2000) (en banc) ("[T]he confinement of sexually violent predators . . . serves a compelling state interest—protection of the public." (citation omitted)). "The government also has a compelling interest in protecting the safety of peace officers . . . ." *Woods*, 23 N.W.3d at 276 (citation omitted). In his brief, Mahana concedes that "[t]he State has a legitimate interest in public safety and disarming dangerous or threatening people." So we turn our attention to the question of narrow tailoring.

1. *Other states with strict-scrutiny protections for the right to bear arms.* Two other state supreme courts have decided that their states' felon-in-possession laws are always valid, notwithstanding provisions in their state constitutions requiring strict scrutiny of firearms restrictions. We will elaborate on why we believe the reasoning of those courts is of limited assistance here.

Missouri, unlike Iowa, added strict scrutiny to a *preexisting* constitutional provision protecting the right to bear arms in 2014. *Dotson v. Kander*, 464 S.W.3d 190, 196 (Mo. 2015) (en banc) (per curiam); *see also* Mo. Const. art. I, § 23. At the same time, it also added the following language, "Nothing in this section shall be construed to prevent the general assembly from enacting general laws which limit the rights of convicted violent felons . . . ." *Dotson*, 464 S.W.3d at 196 (emphasis omitted).

In the companion cases *State v. Merritt*, 467 S.W.3d 808, 814 (Mo. 2015) (en banc) (per curiam), and *State v. McCoy*, 468 S.W.3d 892, 897 (Mo. 2015) (en banc) (per curiam), the Missouri Supreme Court considered the constitutionality of felon-in-possession bans in light of this amendment. It concluded,

> Prohibiting felons from possessing firearms is narrowly tailored . . . because "[i]t is well-established that felons are more likely to commit violent crimes than are other law abiding citizens." *United States v. Barton*, 633 F.3d 168, 175 (3d Cir. 2011). Furthermore, "someone with a felony conviction on his record is more likely than a nonfelon to engage in illegal and violent gun use." *United States v. Yancey*, 621 F.3d 681, 685 (7th Cir. 2010).

*Merritt*, 467 S.W.3d at 814 (alteration in original) (footnote omitted); *see also McCoy*, 468 S.W.3d at 897–98.

This "more likely" discussion strikes us as an example of intermediate scrutiny, not strict scrutiny. Felon-in-possession laws undoubtedly further a legitimate state interest in preventing violent crime because, as a class, persons with felony convictions are more likely to commit such crimes than persons without felony convictions. But are all felon-in-possession laws narrowly tailored? What about as applied to persons whose prior felony was a nonviolent offense that had nothing to do with firearms?

Louisiana, like Missouri, has recently added strict scrutiny to a preexisting constitutional guarantee of the right to bear arms. *See State v. Eberhardt*, 145 So. 3d 377, 379 (La. 2014); *see also* La. Const. art. I, § 11. In sustaining Louisiana's felon-in-possession law against a strict scrutiny challenge under that provision, the Louisiana Supreme Court reasoned as follows:

> [T]he law is narrowly tailored in its application to the possession of firearms or the carrying of concealed weapons for a period of only ten years from the date of completion of sentence, probation, parole, or suspension of sentence, and to only those convicted of the enumerated felonies determined by the legislature to be offenses

having the actual or potential danger of harm to other members of the general public.

*Eberhardt*, 145 So. 3d at 385.

However, both those points noted by the Louisiana Supreme Court are inapplicable to Iowa. Iowa Code sections 724.25(1) and 724.26(1) do not have a ten-year expiration date, nor do they limit coverage to specific felonies determined by the legislature to be dangerous. *See* La. Stat. Ann. § 14:95.1 (2022) (enumerating the covered crimes).[9]

We therefore decline at this time to make a broad pronouncement that sections 724.25(1) and 724.26(1) survive an article I, section 1A challenge under *all* circumstances. Any such determination must await consideration in another case.

2. *Mahana's article I, section 1A facial challenge.* Certainly, though, sections 724.25(1) and 724.26(1) are not facially invalid. "In a facial challenge to a statute, the party contends that there is 'no application of the statute [that] could be constitutional under any set of facts.' " *Woods*, 23 N.W.3d at 263 n.2 (alteration in original) (quoting *Doss v. State*, 961 N.W.2d 701, 716 (Iowa 2021)). " 'A facial challenge asserts the law always operates unconstitutionally and not just as applied in particular circumstances,' making it the most difficult

---

[9]In *In re N.S.,* 13 N.W.3d at 834–35, we held that Iowa Code section 724.31, which prohibits the possession of firearms by someone who has had an involuntary mental health commitment, withstood strict scrutiny under article I, section 1A. The plurality opinion discussed *State v. Eberhardt* and noted,

> The Louisiana [felon-in-possession] statute was narrowly tailored in part because it prohibited firearm possession not for life but rather for ten years after the completion of sentence. Iowa law allows persons prohibited from firearm possession by reason of a mental health commitment to petition for restoration of their firearm rights every two years.

*N.S.,* 13 N.W.3d at 831 (citation omitted). But we can't draw the same analogy between the Louisiana felon-in-possession law and the Iowa felon-in-possession law because Iowa's felon-in-possession law doesn't cease to be effective after a certain time period.

challenge a plaintiff can mount." *State v. Amble*, 22 N.W.3d 265, 272 (Iowa 2025) (quoting *Summit Carbon Sols., LLC v. Kasischke*, 14 N.W.3d 119, 126 (Iowa 2024)).

One can easily conceive of persons with a criminal history who need to be disarmed to protect public safety. Such a prohibition on firearms possession is less restrictive than other restraints, such as incarcerating the person or, alternatively, restricting firearms possession by *all* persons in vulnerable areas. When a person commits one or more serious violent offenses, a ban on future possession of a firearm—enforced by a criminal sanction—is a narrowly tailored prophylactic.

We have in the past performed surgery on a statute when it is facially challenged under a strict-scrutiny standard and the modification will bring it into full constitutional compliance. For example, in *State v. Hernandez-Lopez*, 639 N.W.2d 226, 237 (Iowa 2002), we considered a federal and state constitutional challenge to Iowa's statute allowing pretrial detention of material witnesses. We decided that the specific constitutional flaw was that the statute "only require[d] the arresting officer to believe an individual 'might' be unavailable." *Id.* at 239 (quoting Iowa Code § 804.11 (1999)). We fixed that problem by interpreting the statute to require a probable cause showing that the witness would be unavailable. *Id.* With that interpretive correction, we concluded that the statute was "narrowly drawn to encompass only those individuals who have material knowledge to the commission of a felony and will be unavailable for service of a subpoena." *Id.* at 240.

Yet we are not prepared today to put a pencil to sections 724.25(1) and 724.26(1) as we did to the material witness statute in *Hernandez-Lopez*. We

conclude simply that Iowa's felon-in-possession law has some valid applications, and it may *possibly* have some invalid applications. It is not facially invalid.

3. *Mahana's as-applied challenge.* Turning to Mahana's as-applied challenge under article I, section 1A, we believe it is appropriate to take into account both Mahana's prior criminal record and the circumstances relating to his current conviction. *See Woods*, 23 N.W.3d at 284 (Oxley, J., concurring in the judgment) ("In considering Woods's as-applied challenge, we consider the particular facts of his conviction."); *N.S.*, 13 N.W.3d at 823–24 (conducting a detailed review of the record). Our review of these matters leads us to conclude that sections 724.25(1) and 724.26(1), as applied to Mahana, are narrowly tailored to further the state's compelling interests in public safety.

We note that Mahana not only committed a firearms violation in 2018, he repeated the same violation in 2020 and also committed domestic abuse assault causing bodily injury. For the latter two offenses, he pleaded guilty and received a deferred judgment. Although Mahana successfully completed the probation for the deferred judgment, he admits that he wrongfully possessed firearms during that time. This does not weigh in his favor. *See N.S.*, 13 N.W.3d at 824 ("N.S. cites no authority holding that the petitioner's illegal possession and use of firearms can be considered to support judicial restoration of firearm rights. We will not be the first court to embrace that proposition. To the contrary, his conduct—illegally possessing and using firearms—cuts against his petition for restoration.").

Mahana also pleaded guilty to committing first-degree criminal mischief— i.e., causing over $10,000 of property damage. This mayhem preceded Mahana's defiant entry into the Mason City police station with a .22 handgun and ammunition by only six weeks. When Mahana was advised politely on the

telephone on December 5, 2022, that he was not legally allowed to possess firearms, Mahana could have initiated a proceeding to test the constitutionality of this prohibition.[10] The record demonstrates that Mahana is a capable pro se litigant. Instead, Mahana took the path of insisting that he be arrested and charged.

Considering all these facts, we conclude that a ban on Mahana's possession of a firearm as of December 5, 2022, was narrowly tailored to meet the state's compelling interest in public safety. Within the previous five years, Mahana had committed two firearms violations, domestic abuse assault causing bodily injury, and felony-level criminal mischief. Mahana contends that he is "peaceable," quoting Samuel Adams's proposed and rejected amendment which would have stated that the "Constitution shall never be construed to authorize Congress . . . to prevent the people of the United [S]tates who are peaceable citizens from keeping their own arms." His recent criminal history defeats that characterization.

We understand that Mahana holds very strong views about his right to bear arms. But his series of criminal offenses could have resulted in a prison sentence. Instead, Mahana has received a deferred judgment and several grants of probation. The present restriction on his possession of firearms leaves him with far more liberty than a potential prison sentence would.

**V. Conclusion.**

For the foregoing reasons, we affirm Mahana's conviction and sentence.

**Affirmed.**

---

[10]In fact, after he was criminally charged, Mahana tried to file a motion for temporary injunction as part of his criminal case. Mahana could also have initiated a proceeding for the recovery of his .40 handgun that had been confiscated for evidentiary purposes after the campground incident.

Christensen, C.J., and Waterman, McDermott, and May, JJ., join this opinion. McDonald, J., files an opinion concurring in the judgment, in which Oxley, J., joins.

**McDonald, Justice (concurring in the judgment).**

I concur in the court's judgment. I write separately on Mahana's state constitutional challenge to his conviction pursuant to article I, section 1A because I do not think it necessary to reach the strict scrutiny standard to resolve the claim. The state constitutional right to keep and bear arms, properly understood, does not support Mahana's constitutional defense to this prosecution.

In 2022, Iowa voters ratified an amendment to the Iowa Constitution. *See In re N.S.,* 13 N.W.3d 811, 826 (Iowa 2024) (plurality opinion). The amendment, codified as article I, section 1A, recognizes a fundamental right to keep and bear arms:

> The right of the people to keep and bear arms shall not be infringed. The sovereign state of Iowa affirms and recognizes this right to be a fundamental individual right. Any and all restrictions of this right shall be subject to strict scrutiny.

Iowa Const. art. I, § 1A. "By its terms, Amendment 1A recognizes a *fundamental* individual right to keep and bear arms—not an *absolute* right." *N.S.,* 13 N.W.3d at 826.

"In assessing a constitutional challenge to a statute or regulation under article I, section 1A, we must first address the threshold question of whether the constitutional provision is even implicated." *State v. Woods*, 23 N.W.3d 258, 275 (Iowa 2025) (plurality opinion), *petition for cert. filed*, No. 25–5746 (U.S. Sep. 26, 2025); *see also id.* at 283–84 (Oxley, J., concurring in the judgment) (agreeing that article I, section 1A did not protect the defendant's activity but relying on a narrower ground that the activity was carrying a firearm while possessing illegal drugs); *N.S.,* 13 N.W.3d at 836–37 (McDonald, J., concurring in part and

concurring in the judgment) (discussing the threshold test); Todd E. Pettys, *The N.R.A.'s Strict-Scrutiny Amendments*, 104 Iowa L. Rev. 1455, 1481 (2019) (stating that courts should "consider, as a threshold matter, whether the facts in a given claimant's case bring the fundamental right to keep and bear arms into play" and that "states with strict-scrutiny amendments have largely failed to give this gateway question its due, resulting in occasionally problematic rulings"). At least two subsidiary questions must be answered before a court determines the strict scrutiny standard applies. First, what is the nature and scope of the right to keep and bear arms within the meaning of the state constitution? Second, what constitutes an infringement or restriction of that right? These inquiries are logically antecedent to the strict scrutiny analysis the court undertakes; if the challenged law does not infringe or restrict the right to keep and bear arms, then a court need not subject the law to strict scrutiny.

At the threshold stage of the analysis, the first thing to note about article I, section 1A is that it does not create a new right *ex nihilo*. The text of the amendment refers to "[t]he right" of the people to keep and bear arms, and it prohibits the infringement of "this right." Iowa Const. art. I, § 1A. The amendment also "affirms and recognizes" "this right" to be fundamental. *Id.* The amendment's use of the definite article "the" and the adjective "this" demonstrates that the amendment refers to a specific preexisting right. Likewise, the amendment's affirmation and recognition of the right evidences that the amendment is referring to a preexisting right.

This understanding is in accord with how enumerated constitutional rights come to be. In the main, with some exceptions not relevant here, constitutionally enumerated rights are codifications of existing laws, customs, and practices. The constitution "is not the beginning of a community, nor the

origin of private rights; it is not the fountain of law, nor the incipient state of government; it is not the cause, but consequence, of personal and political freedom." *Hanson v. Vernon*, 27 Iowa 28, 74 (1869) *overruled on other grounds by, Bonnifield v. Bidwell*, 32 Iowa 149 (1871). The constitution is "necessarily based upon pre-existing condition of laws, rights, habits and modes of thought" of the people "derived from a known source." *Id.*; *see also Timbs v. Indiana*, 586 U.S. 146, 160 (2019) (Thomas, J., concurring in the judgment) ("Consistent with their English heritage, the founding generation generally did not consider many of the rights identified in [the Bill of Rights] as new entitlements, but as inalienable rights of all men, given legal effect by their codification in the Constitution's text." (alteration in original) (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 818 (2010) (Thomas, J., concurring in part and concurring in the judgment))); *Gray v. Oliver*, 943 N.W.2d 617, 631 (Iowa 2020) (explaining that the constitution protects preexisting common law rights).

The known source from which a constitutionally enumerated right arises is the body of law in place at the time the constitutional provision was adopted. *See Hunter v. Colfax Consol. Coal Co.*, 154 N.W. 1037, 1047 (Iowa 1915); *see also Lennette v. State*, 975 N.W.2d 380, 403–04 (Iowa 2022) (McDonald, J., concurring) ("Like all posited law, the constitution was drafted and adopted at a specific time and was set sail on a sea of preexisting principles, statutes, precedents, customs, and practices that gave meaning and operational effect to the text. In interpreting and applying the constitution, this court is thus bound by the document's meaning in light of the authentic historical context in which it was launched."). For example, in *State v. White*, this court determined the nature and scope of the right to confrontation by considering what the right to confrontation meant at the time article I, section 10 of the Iowa Constitution was

adopted in 1857. 9 N.W.3d 1, 6–7 (Iowa 2024). We looked at the caselaw from that time as an exercise of "our duty" to apply the "familiar principles" of constitutional interpretation by " '[giv[ing] the words used by the framers their natural and commonly-understood meaning' in light of the 'circumstances at the time of adoption.' " *Id.* (quoting *State v. Burns*, 988 N.W.2d 352, 360 (Iowa 2023)). Based on the law existing at the time the constitution was adopted, this court concluded that the right to confrontation included the right to physical confrontation of the witness in the courtroom. *See id.*

By way of another example, in *Planned Parenthood of the Heartland, Inc. v. Reynolds ex rel. State*, this court considered whether abortion was within the scope of article I, section 9 of the Iowa Constitution. 9 N.W.3d 37, 49–50 (Iowa 2024). Citing statutes and caselaw from the time of adoption, we determined that abortion was not a fundamental right within the scope of the clause. *Id.* The right to abortion could not fall within the scope of the clause because "common law and statutory prohibitions on abortion [were in place] from the very beginning through modern times. Abortion became a crime in Iowa 'just six months after the effective date of the Iowa Constitution—and remained generally illegal until *Roe v. Wade*[, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973),] was decided over one hundred years later.' " *Planned Parenthood of the Heartland*, 9 N.W.3d at 49–50 (second alteration in original) (citation omitted) (quoting *Planned Parenthood of the Heartland, Inc. v. Reynolds ex rel. State*, 975 N.W.2d 710, 740 (Iowa 2022)).

The original law approach that this court has applied in a variety of other contexts applies with the same force to the right to keep and bear arms. The United States Supreme Court has directed that the nature and scope of the Second Amendment right to keep and bear arms, and the permissible

restrictions on that right, must be determined by examining the preexisting body of law in place at the time the right was constitutionally codified. *See United States v. Rahimi*, 602 U.S. 680, 690–92 (2024) (explaining that court must "examine our 'historical tradition of firearm regulation' to help delineate the contours of the right" (quoting *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022))); *Bruen*, 597 U.S. at 25 ("[R]eliance on history to inform the meaning of constitutional text—especially text meant to codify a *pre-existing* right—is, in our view, more legitimate, and more administrable, than asking judges to 'make difficult empirical judgments' about 'the costs and benefits of firearms restrictions,' especially given their 'lack [of] expertise' in the field." (alteration in original) (quoting *McDonald*, 561 U.S. at 790–91 (plurality opinion))). As the Court explained in *District of Columbia v. Heller*:

> Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad. We would not apply an 'interest-balancing' approach to the prohibition of a peaceful neo-Nazi march through Skokie. The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrong headed views. The Second Amendment is no different.

554 U.S. 570, 634–35 (2008) (citation omitted).

Just like the Second Amendment, the nature and scope of the state constitutional right to keep and bear arms is determined by the body of law in place at the time of its adoption in 2022. *See N.S.*, 13 N.W.3d at 826. Indeed, the court in this case applies this approach to half of article I, section 1A. The constitutional provision provides that "[a]ny and all restrictions of this right shall be subject to strict scrutiny." Iowa Const. art. I, § 1A. The court could turn to dictionaries to determine the ordinary meaning of the words "strict" and

"scrutiny" and conclude that article I, section 1A only requires that courts take a close or hard look at any restriction of the right, but the court does not do that. Instead, the court correctly turns to the well-established body of law in place at the time the amendment was adopted to determine that "strict scrutiny" had a defined legal meaning at that time. It is unclear to me why the court concludes that the preexisting corpus juris is also not relevant in determining the nature and scope of the right to keep and bear arms, what constitutes an infringement of that right, and what constitutes a restriction on that right. All of those determinations necessarily precede the application of strict scrutiny.

The law in place at the time article I, section 1A was adopted shows that the right to keep and bear arms does not apply to those convicted of a felony offense, as defined in Iowa Code section 724.25(1) (2022). The scope of the right to keep and bear arms has always been limited under Iowa law. This state has long regulated the transfer, sale, possession, carry, and use of arms. *See id.* § 3879 (1873) (making it a misdemeanor "[i]f any person carry upon his person any concealed weapon"); *id.* § 4212 (providing that officers could confiscate the weapons of arrestees and deliver the weapons to a magistrate); *id.* ch. 1019, § 1 (McClain ed. Supp. 1884) (criminalizing the sale of firearms to minors); *id.* app. ch. 148, § 1 (Miller ed. 1888) (stating that any person who presented or discharged "any gun, pistol, or other fire-arm at any railroad train, cars or locomotive engine" was guilty of a misdemeanor); *id.* § 5526d (McClain ed. Supp. 1892) (making it a misdemeanor for a "tramp" to carry any firearm); *id.* § 4913-a (Supp. 1907) (criminalizing bringing or attempting to bring any firearm or weapon into any penitentiary, reformatory, or industrial school); *id.* § 4775-1a (Supp. 1913) (prohibiting anyone from going "armed with and hav[ing] concealed upon his person a dirk, dagger, sword, pistol, revolver, stiletto, metallic

knuckles, pocket billy, sandbag, skull cracker, slung shot, or other offensive and dangerous weapons or instruments concealed upon his person; provided that no person under fourteen years of age shall be allowed to carry firearms of any description"); *id.* § 1772 (1924) (stating that no one may "carry a gun or other firearm, except a pistol or revolver, in a motor vehicle unless the same be unloaded in both barrels and magazine and taken apart or contained in a case"); *id.* § 12960-bl to -b2 (1927) (stating that "[n]o person, firm, partnership, or corporation shall knowingly have in his or its possession or under his or its control any machine gun which is capable of being fired from the shoulder or hip of a person, and by the recoil of such gun" and prohibiting anyone from helping another obtain a machine gun); *id.* § 1828.08 (1939) (prohibiting the use of "firearms, fireworks, explosives and weapons" in all state parks and preserves); *id.* § 29C.3 (1977) (granting the Governor greater control to prohibit the possession of firearms in emergency situations); *id.* § 562A.27A(2)(*b*) (1995) (permitting a landlord to file suit against a tenant for recovery of possession of the premises after three days' written notice for, among other things, "[i]llegal use of a firearm or other weapon, the threat to use a firearm or other weapon illegally, or possession of an illegal firearm"); *id.* § 280.21B (Supp. 1995) (compelling schools to "expel from school for a period of not less than one year a student who is determined to have brought a weapon to a school or knowingly possessed a weapon at a school," and a "weapon" meant a firearm); *id.* § 724.4B(1) (making it a class "D" felony for a person to go "armed with, carr[y], or transport[] a firearm of any kind, whether concealed or not, on the grounds of a school," whether a public or nonpublic school).

This state also has a long history of enhancing punishments for crimes committed while armed. The earliest versions of the Iowa Code imposed harsher

penalties for burglary and robbery when the offender was armed. *See id.* §§ 2608–10 (1851) (providing for a prison sentence of up to twenty years for an unarmed burglary but up to a life sentence if armed); *id.* §§ 3859–60 (1873) (robbery while armed with a dangerous weapon was to receive a ten- to twenty-year sentence, compared to a two- to ten-year sentence without a weapon); *id.* § 3892 (providing for a more severe sentence for those who commit the crime of burglary while armed with a dangerous weapon); *see also* Iowa Stat. Laws, Courts §§ 28–33 (Terr. 1839) (adding an additional seven years to the sentence for burglary if "armed with any dangerous weapon"). Firearm possession has remained an aggravating factor in criminal sentencing across a broad range of offenses throughout the state's history. *See* Iowa Code §§ 12901–03 (1935) (making inciting treason a misdemeanor, punishable by six months incarceration, but a felony when armed, punishable by up to five years in prison); *id.* § 902.7 (1979) (requiring a mandatory minimum sentence of five years for forcible felonies involving firearms); *id.* § 719.1 (1991) (elevating the offense of interference with official acts from a simple misdemeanor to an aggravated misdemeanor if committed while armed). This long tradition of enhanced penalties for armed criminality reflects a settled recognition in Iowa law that firearms in the hands of those who have demonstrated a propensity toward criminal conduct pose a heightened danger to public safety.

Most relevant here, Iowa law has explicitly prohibited felons from possessing firearms since 1978, *see* 1976 Iowa Acts ch. 1245 (ch. 1), § 2426 (codified at Iowa Code § 724.26 (Supp. 1977)). This prohibition only became more expansive and more punitive over time. Originally, section 724.26 made it an aggravated misdemeanor to possess a firearm after being convicted of a felony. *See* Iowa Code § 724.26 (Supp. 1977). The penalty was increased in 1990 when

the statute was amended to make it a class "D" felony for any person convicted of a prior felony to knowingly possess, control, receive, or transport a firearm. 1990 Iowa Acts ch. 1147, § 8 (codified at Iowa Code § 724.26 (1991)). In 1997, the legislature expanded the scope of the prohibition when it incorporated juvenile adjudications that would constitute felonies if committed by adults. 1997 Iowa Acts ch. 126, § 47 (codified at Iowa Code § 724.26 (Supp. 1997)). In 2010, the statute was again broadened to add those convicted of certain domestic violence misdemeanors to the prohibition. 2010 Iowa Acts ch. 1083, § 4 (codified at Iowa Code § 724.26(2)–(6) (2011)). This law was in place when article I, section 1A was adopted in 2022. *See* Iowa Code § 724.26 (2022). Most recently, in 2025—after article I, section 1A was adopted—the general assembly did not repeal the law but instead increased the penalty for repeat offenders. *See* 2025 Iowa Acts ch. 104, § 1 (codified at Iowa Code § 724.26(1) (2026)).

Given this preexisting body of law, there is no legal basis to conclude that the state constitutional right to keep and bear arms, as understood in 2022 when the right was codified, extended to felons. Nor is there a basis in any other source of law to support such a claim. At the time article I, section 1A was adopted, Iowa law was in accord with federal statutory law, which prohibited felons, broadly defined, from possessing firearms. *See* 18 U.S.C. § 922(g)(1). Also, at the time article I, section 1A was adopted, Iowa law was in accord with the law of every other state. *See* Ala. Code § 13A-11-72 (2022); Alaska Stat. § 11.61.200 (2022); Ariz. Rev. Stat. §§ 13-3101 to -3102 (2022); Ark. Code Ann. § 5-73-103 (2023); Cal. Penal Code § 29800 (2022); Colo. Rev. Stat. § 18-12-108 (2022); Conn. Gen. Stat. § 53a-217 (2022); 11 Del. Code Ann. tit. 11, § 1448 (2022); Fla. Stat. § 790.23 (2022); Ga. Code Ann. § 16-11-131 (2022); Haw. Rev. Stat. § 134-7 (2022); Idaho Code § 18-3316 (2022); 720 Ill. Comp. Stat. 5/24-1.1 (2022); Ind.

Code § 35-47-4-5 (2022); Kan. Stat. Ann. § 21-6304 (2021); Ky. Rev. Stat. Ann. § 527.040 (2022); La. Stat. Ann. § 14:95.1 (2022); Me. Stat. tit. 15, § 393 (2022); Md. Code Ann., Pub. Safety § 5-133 (West 2022); Mass. Gen. Laws ch. 140, § 131(d) (2022); *id.* ch. 269, § 10; Mich. Comp. Laws § 750.224f (2022); Minn. Stat. § 624.713 (2022); Miss. Code Ann. § 97-37-5 (2023); Mo. Rev. Stat. § 571.070 (2022); Mont. Code Ann. § 45-8-313 (2022); Neb. Rev. Stat. § 28-1206 (2022); Nev. Rev. Stat. § 202.360 (2022); N.H. Rev. Stat. Ann. § 159:3 (2022); N.J. Rev. Stat. § 2C:39-7 (2022); N.M. Stat. Ann. § 30-7-16 (2021); N.Y. Penal Law §§ 265.01(4), .02(5)(ii) (McKinney 2022); N.C. Gen. Stat. § 14-415.1 (2022); N.D. Cent. Code § 62.1-02-01 (2022); Ohio Rev. Code Ann. § 2923.13 (West 2022); Okla. Stat. tit. 21, § 1283 (2022); Or. Rev. Stat. § 166.270 (2021); 18 Pa. Cons. Stat. § 6105 (2022); R.I. Gen. Laws § 11-47-5 (2022); S.C. Code Ann. § 16-23-30 (2022); S.D. Codified Laws § 22-14-15 (2022); Tenn. Code Ann. § 39-17-1307 (2021); Tex. Penal Code Ann. § 46.04 (West 2022); Utah Code Ann. § 76-10-503 (West 2022); Vt. Stat. Ann. tit. 13, § 4017 (2022); Va. Code Ann. § 18.2-308.2 (2022); Wash. Rev. Code § 9.41.040 (2022); W. Va. Code § 61-7-7 (2022); Wis. Stat. § 941.29 (2022); Wyo. Stat. Ann. § 6-8-102 (2022).

There is one additional consideration that supports the conclusion that the nature and scope of the state constitutional right to keep and bear arms does not include the right of felons to keep and bear arms. As noted above, the law at issue in this case has been in place in one form or another since 1978, and it was law at the time article I, section 1A was adopted. "To amend the Iowa Constitution, the legislature must approve identical language in two separate general assemblies with an intervening general election, followed by ratification by a majority of Iowa voters. The legislature first approved the language of Amendment 1A in 2019. The next general assembly approved identical language

in 2021. Iowa voters ratified the language on November 8, 2022." *N.S.*, 13 N.W.3d at 826 (citations omitted). This court must "presume that the general assembly, in twice approving the amendment before submitting it to the people for a referendum, did not intend the amendment to overturn the numerous laws on the books" restricting who could possess firearms. *Woods*, 23 N.W.3d at 275. "It would be absurd to suggest the legislature intended to approve a constitutional amendment that *struck down its own law . . . .*" *Chiodo v. Sec. 43.24 Panel*, 846 N.W.2d 845, 862 (Iowa 2014) (Mansfield, J., specially concurring).

Mahana ignores all of this and instead reads article I, section 1A as though it were written on a blank slate without any preexisting law that defined the nature and scope of the right it protects. When we apply the traditional tools of constitutional interpretation and construction to article I, section 1A that we apply in all other contexts, and that the court applies to half of article I, section 1A, it is clear that the nature and scope of the state constitutional right to keep and bear arms does not include the right of felons to keep and bear arms. Thus, Iowa Code sections 724.25 and .26 do not "infringe" or "restrict" Mahana's fundamental right to keep and bear arms.

For these reasons, I concur in the court's judgment affirming Mahana's conviction.

Oxley, J., joins this concurrence in the judgment.